# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOSEPH REGENSBERGER, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 3:04-CV-01900 (PCD) |
| | : | |
| THE CITY OF WATERBURY, et al., | : | |
| Defendants. | : | |

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Joseph Regensberger brings this action pursuant to 42 U.S.C. § 1983, challenging Section 5.12-13 of the Waterbury Zoning Ordinance ("the Adult Establishment Regulation") as violative of the First and Fourteenth Amendments of the United States Constitution. On March 9, 2006, Plaintiff moved for summary judgment [Doc. No. 44]. On June 29, 2006, Defendants the City of Waterbury, Connecticut ("Waterbury" or the "City") and James A. Sequin filed a cross-motion for summary judgment [Doc. No. 56]. For the reasons stated herein, Plaintiff's motion is **denied** and Defendants' motion is **granted.**

## I.   BACKGROUND[1]

On June 3, 2004, Plaintiff Joseph Regensberger, a resident of the City of Fairfield, Connecticut, entered into a contingent contract for the purchase of a property and existing restaurant business located at 19-23 Lafayette Street, Waterbury, Connecticut (the "Lafayette Street site" or the "subject property"). (Pl.'s Local R. 56(a)(1) Statement ¶ 1; Defs.' Opp. to Pl.'s Mot. for Summ. J., Ex. G., Regensberger Dep. Tr. at 28-34.) Defendant City of Waterbury, Connecticut (the "City"), is a municipal corporation, organizing and existing under the laws of the State of Connecticut. Defendant James A. Sequin is the Zoning Administrator for the City of

---

[1] Facts taken from either party's Local Rule 56(a)(1) Statements are undisputed unless otherwise noted.

Waterbury.  Waterbury occupies 28.9 square miles, or approximately 18,496 acres.  (Defs.' Local R. 56(a)(1) Statement ¶ 11.)

Plaintiff brings a facial and as applied challenge to the constitutionality of Section 5.12-13 ("the Adult Establishment Regulation") of the Waterbury Zoning Ordinance, which provides:

> **Adult establishments**.  Adult establishments are a permitted use in the IG zone subject to submission of a plot plan and approval by the Zoning Administrator and the following conditions:
>
> (a) No building or premises shall be used, and no building shall be erected or altered, which is arranged, intended or designed to be used for an adult establishment if any part of such building or premises is situated on any part of a lot within a seven hundred fifty (750) foot radius in any direction of any property zoned for single-family or multiple-family residential use; or any lot used for, or upon which is located any building used for:
>
>> (1) any public or private school, or any other facility regularly attended by persons under the age of eighteen (18), including, but not limited to, after school programs, children's, museums, camps, and athletic leagues;
>>
>> (2) any church or religious facility or institution;
>>
>> (3) any public park; or
>>
>> (4) any other adult establishment.

(Defs.' Ex. A, City of Waterbury Zoning Regulations, Public Hearing Copy with Amendments through May 27, 2004, Section 5.12-13 at 45.)

### A.      Adoption of the Adult Establishment Regulation

Section 5.12-13 was adopted by the Waterbury Planning & Zoning Commission on May 27, 2004, after a review process conducted by various levels of City government.  (See Pl.'s Local R. 56(a)(1) ¶ 14, Exs. A, B, C.)  On December 18, 2003, the Zoning Commission referred several proposed adult establishment regulations to the City Plan Commission for recommendation.  (Defs.' Local R. 56(a)(1) Statement ¶ 1.)  On February 9, 2004, the City Plan Commission for the City of Waterbury voted to recommend approval of the proposed regulations governing adult establishments.  (Id. at ¶ 2.)  The City held public hearings before its Zoning

Commission on the proposed regulations on February 26, 2004, and April 22, 2004. (<u>Id.</u> at ¶ 3.)

At the February 26, 2004 hearing, Defendant James Sequin, who was at that time the Waterbury

City Planner, submitted documentation for the Commission's consideration, including several

"adverse secondary effects" studies from other municipalities or summaries thereof, and testified

about those studies. (<u>Id.</u> at ¶ 4; Exs. B1, J-U.) On May 24, 2004, the Zoning Commission

adopted Section S.12.13 of its Zoning Ordinance, which became effective on May 30, 2004. (<u>Id.</u>

at ¶ 5.)

Both Plaintiff and Defendants have submitted expert evidence regarding Sequin's

presentations at the zoning hearings on the "secondary adverse effects" of adult establishments

on surrounding neighborhoods. Plaintiff has submitted evidence showing that, contrary to the

evidence presented by Sequin at the zoning hearings, Waterbury's own experience indicated that

existing adult business uses have not adversely affected property values in the City of Waterbury.

(Pl.'s Local R. 56(a)(2) Statement ¶ 1, Ex. A, Rule 26 Report of Bruce McLaughlin at 1-39

("McLaughlin Report").) Defendants, however, contend that Mr. McLaughlin's findings

regarding Waterbury property values are flawed because he did not consider the fact that

Waterbury had not conducted property revaluations between 1980 and 2001. (Defs.' Resp. to

Pl.'s Local R. 56(a)(2) Statement ¶ 1, Ex. A, Affidavit of David M. Dietsch ¶¶ 4-5.) Plaintiff

further submits that the methodology employed by the drafters of the foreign studies upon which

the City relied in adopting the Adult Establishment Regulation was not sound and therefore casts

serious doubt as to their validity. (Pl.'s Local R. 56(a)(2) Statement ¶ 3; McLaughlin Report CD;

Rule 26 Report of Dr. Randy Fisher ("Fisher Report") at 55-81; Dr. Richard McCleary Depo. Tr.

at 43-49, 147-77.) The report by Plaintiff's expert Dr. Randy Fisher also contends that the basis

of the "secondary effects" findings by Defendants' expert Dr. Richard McCleary is seriously flawed. (Pl.'s Local R. 56(a)(2) Statement ¶ 4; Fisher Report at 1-59.) According to Defendants, however, Dr. Fisher is not an expert in criminology or in statistics and is therefore unqualified to critique Dr. McCLeary's findings on criminological theory or statistical methodology. (Defs.' Resp. to Pl.'s Local R. 56(a)(2) Statement ¶ 4; Pl.'s Opp. to Summ. J. Ex. B, Fisher Report at 91.)

Plaintiff's expert Bruce McLaughlin also posits in his Rule 26 Report that the City has not provided "adequate alternative avenues of communication" for "adult establishments." (McLaughlin Report at 40-45.) Contained within the City's 28.9 square miles (18,496 acres) are 2,746 commercial parcels along with 1,516 industrial parcels which are zoned for some generic commercial uses. (Id. at 7.) According to Dr. McLaughlin, the area available to an Adult Use at most amounts to 0.44% of the total area of the city, 0.33% of the City's commercial parcels, and 0.21% of the City's commercial and industrial parcels. (Id. at 45-46.) The two sites actually available for an Adult Use at the time Dr. McLaughlin issued his report amounted to 0.07% of the commercial parcels in the City and 0.05% of the commercial and industrial parcels in the city. (Id. at 46.) Defendants dispute Dr. McLaughlin's findings on the basis that the Second Circuit has rejected Mr. McLaughlin's restrictive analysis of alternative avenues of communication. See Casanova Entm't Group, Inc. v. City of New Rochelle, 375 F. Supp. 2d 321 (S.D.N.Y. 2005), aff'd, 165 F. App'x 72, 2006 WL 238434, at *1 (2d Cir. Jan. 31, 2006).

The parties also dispute what conditions Section 5.12-13 actually imposes on a potential Adult Establishment. Plaintiff reads the language "subject to submission of a plot plan and approval by the Zoning Administrator and the following conditions" to mean that Adult

Establishments may be allowed as a special conditional use in an IG Zoning District subject to the submission of a plot plan and the sole approval of the Zoning Administrator, as well as subject to the locational restrictions. (Pl.'s Local R. 56(a)(1) Statement ¶ 11.)[2] Defendants dispute this reading insofar as it implies that a separate approval by the Zoning Administrator, other than the approval of a pro forma plot plan, is required. According to Defendants, Section 5.12-13 requires an applicant to submit a plot plan to the Zoning Administrator for his review and approval, but this plot plan 'approval' is automatic and not subject to the discretion of an individual administrator.

### B.    Plaintiff's Proposed Usage

Plaintiff proposes to change the nature of the existing restaurant business located on the Lafayette Street site to an "adult cabaret" featuring live entertainment, including exotic dancing in which the female performers would perform sexually expressive dance routines with their breasts exposed. (Compl. ¶ 11; Pl.'s Local R. 56(a)(1) Statement ¶ 5.) Such entertainment would be classified as an "Adult Cabaret," as defined in Section 8.3.95 of the Zoning Regulations of the City of Waterbury. Section 8.3.95 provides in relevant part:

> [A]dult cabaret means a nightclub, bar, restaurant or similar establishment that regularly feature live performances that are characterized by obscene activities, the exposure of specific anatomical areas or by specified sexual activities, or the presentation of films, motion pictures, video, slides or other digital or photographic reproductions in which a substantial portion of the total presentation time is devoted to the showing of material that is characterized by any emphasis upon the depiction or description of obscene activities, specified sexual activities, or anatomical areas.

(Defs.' Ex. A, § 8.3.95.) An "Adult Cabaret" is one of the establishments defined in the City's

---

[2]    Plaintiff also reads the ordinance to mean that an "Adult Establishment" as defined by Section 8.3.96 is also subject to the approval of the Zoning Administrator. Id. ¶ 12.

Zoning Regulations as an "Adult Establishment." (Id.. § 8.3.96.[3]) As referred to in the definition

of an "Adult Cabaret," a "substantial portion" of the total presentation time with regard to adult

establishment means "twenty-five percent or more of the total running time is distinguished or

characterized by an emphasis upon the depiction or description of obscene activities, specified

sexual activities or specified anatomical areas." (Id. § 8.3.103.) "Specified anatomical areas"

means anatomical areas that are:

> (1)   less than completely and opaquely covered:
>     a.   Human genitals, pubic region;
>     b.   Buttock; or
>     c.   Female breast below a point immediately above the top of the areola; and
> (2)   human male genitals in a discernibly turgid state, even if completely and opaquely covered.

(Id. § 8.3.104.) "Special sexual activities" means:

> (1)   human genitals in a state of sexual stimulation or arousal;
> (2)   actual or simulated acts of human masturbation, sexual intercourse or sodomy; oral copulation or
> (3)   fondling or other erotic touching of human genitals, pubic regions, buttocks or female breasts.

(Id. § 8.3.105.) Plaintiff is therefore subject to the requirements of Section 5.12-3.

        The Lafayette Street site is within the IG Zoning District and lies within a seven-hundred

fifty foot radius of property which is zoned for a church use. (Pl.'s Local R. 56(a)(1) Statement ¶

13.) Plaintiff asserts that the site is approximately fifteen feet short of the required 750-foot

separation from the neighboring church. (Id. at ¶ 15.) Defendants do not dispute that the subject

property is within the 750-foot buffer from a sensitive receptor as defined by the City's zoning

---

[3]     Section 8.3.96 provides in full: "Adult establishment means adult bookstore, adult cabaret, adult hotel/motel, adult modeling studio, adult mini-motion-picture-theater or adult motion picture theater, or any combination thereof or any establishment which defines itself as a [sic] adult bookstore, adult cabaret, adult mini-motion-picture-theater or adult motion picture theater, or any combination thereof."

ordinance, though they do not recall the exact distance between the church and the subject property. (Defs.' Local R. 56(a)(2) Statement ¶ 15.) Plaintiff asserts that the encroachment area to the subject property is separated from the church by property belonging to the State of Connecticut for use as the highway known as Route 8. (Pl.'s Local R. 56(a)(1) Statement ¶ 15.) Defendants dispute that Route 8 separates the church from the subject property because there is access between the two properties by at least two public City streets. (Defs.' Local R. 56(a)(2) Statement ¶ 15; Aff. of James Sequin ¶ 14.)

On June 14, 2004, Plaintiff requested a zoning compliance letter from the City for a proposed adult cabaret at the Lafayette Street site. (Defs.' Local R. 56(a)(1) Statement ¶ 7; Ex. E.) Gil Graveline, who was Zoning Administrator for the City of Waterbury at that time, informed Plaintiff on July 21, 2004 that he did not meet the zoning requirements for an adult cabaret at that location because the property is within 750 feet of a church, one of the sensitive receptors specified in the Adult Establishment Regulation. (Defs.' Local 56(a)(1) Statement ¶ 8; Ex. F.) Plaintiff did not submit a plot plan for review and approval by the Zoning Administrator. (Defs.' Local 56(a)(1) Statement ¶ 9.) (As of June, 2006, the Zoning Administrator had not acted upon a request to create an "Adult Establishment" since the adoption of Section 5.12-134 on May 27, 2004. (Pl.'s Local R. 56(a)(1) ¶ 16; Defs.' Local Rule 56(a)(1) ¶ 11.)) Plaintiff asserts that in the event he is unable to locate his adult cabaret at the present location on Lafayette Street, he would like to find a permitted location elsewhere in Waterbury but he is chilled and deterred from doing so by the Conditional Use Requirement of Section 5.12-13. (Pl.'s Local R. 56(a)(2) ¶ 7; Ex. E, Regensberger Aff. ¶ 7.) As Defendants point out, though, Plaintiff had previously testified that he has not pursued alternative locations for his proposed adult cabaret because he

was "busy." (Defs.' Resp. to Pl.'s Local R. 56(a)(2) Statement ¶ 7; Ex. B, Regensberger Dep. Tr. at 42-43.)

On November 12, 2004, Plaintiff filed his Complaint, seeking declaratory and injunctive relief[4] against the enforcement of the Adult Establishment Regulation on the grounds that it violates the First and Fourteenth Amendments of the United States Constitution. Specifically, Plaintiff requests: a permanent injunction enjoining the Defendants from enforcing the locational restrictions against Plaintiff and requiring prior approval by the Zoning Administrator as found in the Adult Establishment Regulation; a declaratory judgment that the locational restrictions in the Adult Establishment Regulation and the required approval by the Zoning Administrator are null and void in violation of the First Amendment to the United States Constitution; damages; and attorney's fees and costs. After extensions of time to conduct further discovery and additional expert disclosures, Plaintiff moved for summary judgment, and Defendants filed a cross-motion for summary judgment.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). No genuine issue of material fact exists when "the record taken

---

[4] In his motion for summary judgment, Plaintiff makes a passing request for preliminary injunctive relief, a request that would be procedurally and substantively improper at this stage in the proceedings as he neither included such a request in his Complaint nor made an application for preliminary relief under Fed. R. Civ. P. 65. However, Plaintiff admits in a subsequent filing that this was a typographical error. (See Pl.'s Reply at 2.) Accordingly, the Court will consider only his requests for a declaratory judgment and a permanent injunction.

as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A material fact is one which "might affect the outcome of the suit under the governing law," and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Claims of facial invalidity may be resolved on summary judgment since they involve questions of law and do not often present disputed issues of fact. Centerfolds, Inc. v. Town of Berlin, 352 F. Supp. 2d 183, 189 (D. Conn. 2004) (citing Hang-On, Inc. v. City of Arlington, 65 F.3d 1248, 1253 (5th Cir. 1995)).

The initial burden falls on the moving party, who is required to "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets its burden, the burden shifts to the party opposing summary judgment to set forth "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). The non-moving party "may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that 'its version of the events is not wholly fanciful.'" Morris v. Lindau, 196 F.3d 102, 109 (2d Cir. 1999) (quoting D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)).

The same legal standards apply when considering cross-motions for summary judgment. A court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Make the Road by Walking, Inc. v. Turner, 378 F .3d 133, 142 (2d Cir. 2004) (citations omitted); see also Scholastic, Inc. v. Harris, 259 F.3d 73, 81 (2d Cir. 2001). A court must deny both parties' motions for summary judgment if it finds the existence of disputed material facts. Morales v.

*Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).  Therefore, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  Id. at 121.

## III.     DISCUSSION

### A.     First Amendment Principles

The First Amendment protects the expressive conduct of nude dancing and the settings of adult establishments.  <u>City of Erie v. Pap's A.M.</u>, 529 U.S. 277, 289, 120 S. Ct. 1382, 146 L. Ed. 2d 265 (2000); <u>Schad v. Borough of Mt. Ephraim</u>, 452 U.S. 61, 66, 101 S. Ct. 2176, 68 L. Ed. 2d 671 (1981); <u>Roaden v. Kentucky</u>, 413 U.S. 496, 504, 93 S. Ct. 2796, 37 L. Ed. 2d 757 (1973). Consistent with the First Amendment, a municipality may enact zoning ordinances which limit adult-entertainment businesses to particular locations provided that the regulations target the negative secondary effects of adult entertainment and the limitations leave open "reasonable alternative avenues of communication."  <u>Buzzetti v. City of New York</u>, 140 F.3d 134, 140-41 (2d Cir. 1998) (<u>citing</u> <u>City of Renton v. Playtime Theatres, Inc.</u>, 475 U.S. 41, 53-54, 106 S. Ct. 925, 89 L. Ed. 2d 29 (1986)).  The purpose and effect of these regulations must be to reduce negative secondary effects associated with adult entertainment rather than to reduce speech.  <u>City of Los v. Angeles Alameda Books</u>, 535 U.S. 425, 445, 122 S. Ct. 1728, 152 L. Ed. 2d 670 (2002) (Kennedy, J., concurring).  Courts review such zoning ordinances under the intermediate scrutiny standards applicable to content-neutral time, place, and manner regulations.  <u>Renton</u>, 475 U.S. at 49, 106 S. Ct. 925; <u>see also</u> <u>Charette v. Town of Oyster Bay</u>, 159 F.3d 749, 754 (2d Cir. 1998); <u>Casanova</u>, 375 F. Supp. 2d at 334; <u>MJ Entm't Enterprises, Inc. v. City of Mount Vernon</u>, 328 F. Supp. 2d 480, 484 (S.D.N.Y. 2004).  A regulation may be upheld if the government proves that it

is "designed to serve a substantial government interest and allows for reasonable alternative communication." <u>Renton</u>, 475 U.S. at 50, 106 S. Ct. 925. <u>See also</u> <u>Centerfolds, Inc.</u>, 352 F. Supp. 2d at 190.[5]

Plaintiff argues that even if the Court finds that Waterbury has shown a substantial government interest and that available alternative sites would permit adult entertainment, the Adult Establishment Regulation is still unconstitutional because it requires all adult uses to obtain the plot plan approval of the Zoning Administrator without setting forth sufficiently objective standards to guide his decision. Therefore, according to Plaintiff, Waterbury cannot satisfy the alternative means of communications prong of the secondary effects test because the First Amendment requires that adequate sites exist where adult businesses may be located as a matter of right. Plaintiff further contends that the requirement of plot plan approval by the Zoning Administrator acts as a prior restraint on protected speech, thereby turning the Adult Establishment Regulation into a content-based licensing scheme that is entitled to strict scrutiny. Consequently, the Court will consider the plot plan approval issue first. <u>See</u> <u>Casanova</u>, 375 F. Supp. 2d at 334.

### B. Plot Plan Approval by the Zoning Administrator

In addition to the locational restrictions imposed on adult establishments, the Adult

---

[5]     Plaintiff relies on <u>Playboy Entertainment Group, Inc. v. United States</u>, 529 U.S. 803, 120 S. Ct. 1878, 146 L. Ed. 2d 865 (2000), to argue that because this cases involves constitutionally protected speech, the government bears the burden of proving the constitutionality of its actions. 529 U.S. at 816, 120 S. Ct. 1878. However, <u>Playboy</u> involved a challenge to the Telecommunications Act of 1996, which the Supreme Court determined was a content-based restriction subject to strict scrutiny. <u>Id.</u> at 811-12, 120 S. Ct. 1878. In doing so, the Supreme Court explicitly stated that "the lesser scrutiny afforded regulations targeting secondary effects ... has no application to content-based regulations targeting the primary effects of protected speech," <u>id.</u> at 815, 120 S. Ct. 1878, and, by the same reasoning, strict scrutiny cases have no application in analyzing content-neutral restrictions. <u>Connection Distributing Co. v. Gonzalez</u>, No. 1:95CV1993, 2006 WL 1305089, at *7 (N.D. Ohio May 10, 2006).

Establishment Regulation requires an applicant to submit a plot plan to and receive approval

from the Zoning Administrator.  (Defs.' Ex. A, § 5.12-13.)  The Adult Establishment Regulation

falls under Article V, Section 5.1 of the Waterbury Zoning ordinance, which provides for Special

Conditional Uses and states in relevant part:

> **5.11** **General.** Each of the special conditional uses (S) listed in section 2.3 is permitted in each zoning district to the extent indicated for that use and district, subject to all provision [sic] of the applicable zoning district except as specifically provided for in this section.
>
> Every application for use of property subject to conditions set forth herein shall be filed with the zoning administrator or city plan commission, or zoning commission, in accordance with the provisions of this ordinance and shall be subject to approval by the zoning administrator and any other commission, board, or agency stipulated in this section**.**

(Id. § 5.11.)  Section 5.12, subsections 5.12-1 through 5.12-14, identifies the various Special

Conditional Uses that are permitted subject to "submission of a plot plan and approval by the

Zoning Administrator and the conditions set forth herein," including, among other things, adult

establishments, animal hospitals, funeral homes, places of religious worship, golf driving ranges,

and bars.  (Id. § 5.12.)  In contrast, Section 5.13 identifies uses, such as, among other things,

cemeteries, boarding houses, day care centers, and junk yards, which may be permitted subject to

"a public hearing, approval of a special exception by the zoning board of appeals, and the

conditions set forth herein."  (Id. § 5.13.)

Plaintiff argues that the plot plan approval language of the Adult Establishment

Regulation allows the Zoning Administrator substantial and unfettered discretion in deciding an

adult establishment conditional use application.  Defendants contend that Plaintiff does not have

standing to raise a challenge to the Regulation's plot plan approval provision because Plaintiff

has failed to meet the locational requirements of the Regulation.  As of the filing of these

motions, Plaintiff had not even submitted a plot plan for review to the Zoning Administrator. Consequently, because Plaintiff has not been adversely affected by the plot plan approval requirement, he has failed to allege an "injury in fact."  See Valley Forge Christian Coll. v. Amers. United for Separation of Church & State, 454 U.S. 464, 472, 102 S. Ct. 752, 70 L. Ed. 2d 700 (1982) (Article III standing requires a litigant to demonstrate that he suffered actual or threatened injury).  He therefore lacks standing to assert that the Regulation is unconstitutional based on the plot plan approval provision.  See Casanova, 375 F. Supp. 2d at 375; MJ Entm't Enter., 234 F. Supp. 2d at 311-12.  However, the plot plan approval provision is relevant to Plaintiff's assertion that there are no available avenues of communication in Waterbury because the discretion afforded the Zoning Administrator by the plot plan approval provision forecloses the ability to locate an adult establishment as a matter of right.  Therefore, the Court must first consider whether the plot plan approval provision eliminates any supposedly alternative avenues of communication by precluding an entrepreneur from opening an adult establishment on any of those sites as a matter of right.  Casanova, 375 F. Supp. 2d at 335.

Plaintiff argues that because the Adult Establishment Regulation requires plot plan approval by the Zoning Administrator, the regulation is a prior restraint that must be analyzed as a licensing scheme.  There is a strong presumption against the use of prior restraints when dealing with expressive activity protected by the First Amendment.  Casanova, 375 F. Supp. 2d at 336 (citing Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 559, 96 S. Ct. 2791, 49 L. Ed. 2d 683 (1976) (noting that prior restraints "are the most serious and least tolerable infringement on First Amendment rights")).  A licensing ordinance placing "unbridled discretion" in the hands of a government official or agency constitutes a prior restraint.  Lakewood v. Plain Dealer Publ'g

Co., 486 U.S. 750, 757, 108 S. Ct. 2138, 100 L. Ed. 2d 771 (1988). "Consequently, '[a]n ordinance that gives public officials the power to decide whether to permit expressive activity must contain precise and objective criteria on which they must make their decisions; an ordinance that gives too much discretion to public officials is invalid.'" Casanova, 375 F. Supp. 2d at 337 (quoting Lady J. Lingerie, Inc. v. City of Jacksonville, 176 F.3d 1358, 1361 (11th Cir. 1999)). Thus, a special permit system must include "narrow, objective, and definite standards" to control a government's discretion. Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150-51, 89 S. Ct. 935, 22 L. Ed. 2d 162 (1969); see also Charette, 159 F.3d at 754. The Supreme Court also requires that the license for a First Amendment-protected business or activity be issued within a reasonable amount of time. City of Littleton v. Z.J. Gifts D-4, 541 U.S. 774, 780-81, 124 S. Ct. 2219, 159 L. Ed. 2d 84 (2004). Thus, if a special permit or licensing ordinance grants the Zoning Administrator unbridled discretion or fails to place limits on the time within which the decisionmaker must approve the plan proposal, it must be held unconstitutional. FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 225-26, 110 S. Ct. 596, 107 L. Ed. 2d 603 (1990); Lakewood, 486 U.S. at 757, 108 S. Ct. 2138; Lady J. Lingerie, 176 F.3d at 1362.

Plaintiff contends that Section 5.12-13 grants the Zoning Administrator unbridled discretion because it does not establish criteria for approving a plot plan submitted by an adult establishment entrepreneur. However, Section 5.12-13 is properly understood as part of the entire zoning ordinance's regulatory scheme and subject to the limitations included in other provisions of the zoning ordinance. "[Z]oning regulations are local legislative enactments and, therefore, their interpretation is governed by the same principles that apply to the construction of statutes." Campion v. Bd. of Aldermen of City of New Haven, 278 Conn. 500, 510, 899 A.2d

542 (2006) (quoting Wood v. Zoning Board of Appeals, 258 Conn. 691, 699, 784 A.2d 354 (2001)). A court must interpret a zoning ordinance, like any other statute, as written, and "it is to be considered as a whole, with a view toward reconciling its separate parts in order to render a reasonable overall interpretation." Hall Manor Owner's Ass'n v. West Haven, 212 Conn. 147, 154, 561 A.2d 1373 (1989) (internal citations and quotation marks omitted). See also R. Fuller, 9A Connecticut Practice Series: Land Use Law and Practice (1993) § 34:6 at 229, 301-02. Accordingly, Section 5.12-13 and the other conditional use provisions must be read in conjunction with Article VII, which establishes the particular technical requirements of a plot plan and the approval process by the Zoning Administrator.

Read as a whole, the Waterbury Zoning Ordinance delegates limited, objective powers and responsibilities to the Zoning Administrator in regards to the approval of plot plans. The Zoning Administrator's responsibilities and enforcement powers, including his responsibility for plot plan review, are provided in Article VII, Section 7.1 of the Waterbury Zoning Ordinance. In Section 7.13, "Building Permits," the Ordinance describes a "plot plan" and provides a "Typical Plot Plan" diagram. Section 7.13 provides that a plot plan "shall be a Class A-2 survey map made by a Connecticut registered land surveyor," including such building specifications as proposed constructions, additions, front, side, and rear yards, off-street parkings, lot coverage, and sewer systems. A plot plan contains "all the information necessary to enable him to decide whether the proposed building, alteration, addition, or use complies with all the provisions" of the Waterbury Zoning Ordinance. The plot plan must also indicate certain details regarding the recording of the land's title and include an as-built certification by a licensed surveyor if a foundation is applied for. (Defs.' Ex. A, § 7.13.) Section 7.13 therefore establishes relatively

specific and technical criteria for reviewing and approving a plot plan, and it does not authorize the Zoning Administrator to use any other discretionary standards of review or to broadly consider public health, safety, or welfare in reviewing a plot plan.  The limited authority of the Zoning Administrator in approving a plot plan is contrasted by the broader discretion granted to the city plan commission in approving what the Waterbury Zoning Ordinance calls a "site plan." The Ordinance requires a public hearing to review an applicant's site plan proposal, and it authorizes the city plan commission to modify, approve, or disapprove "any site plan element found contrary to the provisions and intent of this ordinance," and to "attach safeguards and conditions to ensure public safety and welfare."  (Id. § 7.43.)

As Defendants note, the "plot plan" of the Waterbury Zoning Ordinance functions like what other municipalities ordinarily dub a "site plan," described in the leading Connecticut land use treatise as a:

> plan filed with a zoning commission or other municipal agency or official to determine the conformity of a proposed building, use or structure with specific provisions of the zoning regulations. It is a physical plan showing the layout and design of a proposed use, including structures, parking areas and open space and their relation to adjacent uses and roads, and containing the information required by the zoning regulations for that use. *The agency has no independent discretion beyond determining whether the plan complies with the site plan regulations and applicable zoning regulations incorporated by reference.*  'A site plan may be modified or denied only if it fails to comply with requirements already set forth in the regulations.'

R. Fuller, 9 Connecticut Practice Series: Land Use Law and Practice (1993) § 2.2 at 23 (quoting Conn. Gen. Stat. § 8-3(g)) (emphasis added); see also Barberino Realty & Dev. Corp. v. Planning & Zoning Comm'n, 222 Conn. 607, 613-14, 610 A.2d 1205 (1992); SSM Assocs. Ltd. P'ship v. Plan & Zoning Comm'n, 15 Conn. App. 561, 566-67, 545 A.2d 602 (1988), aff'd, 211 Conn. 331, 559 A.2d 196 (1989); Allied Plywood, Inc. v. Planning & Zoning Comm'n, 2 Conn. App.

506, 512, 480 A.2d 584, <u>cert. denied</u>, 194 Conn. 808, 483 A.2d 612 (1984). An administrator's review of what is generally termed a "site plan" does not involve consideration of any factors other than the specific conditions outlined in the regulation. If the plan conforms to the regulations, the administrator has no discretion or choice but to approve it. See <u>R&R Pool & Patio, Inc. v. Zoning Bd. of Appeals</u>, 257 Conn. 456, 468-69 (2001) ("If the application conforms to the zoning regulations, the board cannot deny the application for subjective reasons that bear no relationship to zoning regulations." (<u>citing</u> <u>Kosinski v. Lawlor</u>, 177 Conn. 420, 423-24, 418 A.2d 66 (1979))).

Reading the plot plan approval provision in isolation, Plaintiff misreads the limited authority granted to the Zoning Administrator in approving plot plan and fails to appreciate the limited discretion he has in this function compared to other zoning responsibilities. Unlike when the Waterbury City Plan Commission reviews site plan proposals, the Zoning Administrator is not authorized to consider the public health, safety, and welfare when reviewing a plot plan application, nor is he empowered to hold a public hearing to consider the application. <u>See</u> <u>Charette</u>, 159 F.3d at 755 (reviewing special permits on the basis of an administrator's "views as to health, safety, welfare, comfort, convenience and order... [are] broad standards of the type that have been held insufficient to pass First Amendment muster."); <u>Irwin v. Planning & Zoning Comm'n of the Town of Litchfield</u>, 244 Conn. 619, 627, 711 A.2d 674 (1998) (noting that a public hearing requirement signifies greater discretion granted to administrators, because if the "process were purely ministerial there would be no need to mandate a public hearing") (citations omitted). The plot plan approval provision of Section 5.12-13 therefore does not grant the administrator such discretion as to become a kind of special permit or license which raises First

Amendment problems and eliminates the opportunity to open an adult establishment on an alternative location as a matter of right.  Cases relied upon by Plaintiff which have held otherwise all involve regulatory schemes which gave zoning boards greater discretion to review applications at a hearing or which overtly required an adult establishment to obtain a special permit or license.   See, e.g., B&V Greene Inc. v. City of Albany, No. 99-CV-921, 2000 WL 1876426, at *1, *5 (N.D.N.Y. Dec. 18, 2000) (finding likelihood of success on First Amendment challenge to special permit requirement which empowered zoning authorities to use "ambiguous and indefinite requirements" such as considering public health, safety, and convenience); 801 Conklin St. Ltd. v. Town of Babylon, 38 F. Supp. 2d 228, 244 (E.D.N.Y. 1999) (adult establishment ordinance unconstitutional where it enumerated "open-ended nebulous requirements" for the zoning board to consider at a public hearing).  Compare Brownell v. City of Rochester, 190 F. Supp. 2d 472, 500 (W.D.N.Y. 2001) (license requirement constitutional where it provided the administrator "shall" issue the license provided a few specific conditions were met).

Accordingly, the Waterbury Zoning Ordinance provisions regarding plot plan approval provide objective and reasonable standards by which the Zoning Administrator must render his decisions on plot plan applications.  Section 5.12-13 therefore allows for alternative avenues of communication as of right where the proposed use conforms to the applicable zoning requirements set forth in the ordinance.  Questions of prior restraint and administrative discretion aside, the Court can proceed to review the constitutionality of the Adult Establishment Regulation pursuant to the time, place, and manner standard applied to zoning regulations designed to curb the negative secondary effects of adult establishments.

18

### C. Substantial Government Interest

The Supreme Court has held that local governments have an "undeniably important" interest in combating the adverse secondary effects of sexually oriented businesses. Pap's A.M., 529 U.S. at 291, 120 S. Ct. 1382. When drafting ordinances and regulations aimed at combating secondary effects, municipalities may rely upon any evidence "reasonably believed to be relevant." Pap's A.M., 529 U.S. at 283, 120 S. Ct. 1382; see also Alameda Books, 535 U.S. at 438, 122 S. Ct. 1728 (plurality opinion); Renton, 475 U.S. at 51-52, 106 S. Ct. 925. A municipality's legislative record need not be based on empirical data or constitute a scientific study, Pap's A.M., 529 U.S. at 300, 120 S. Ct. 1382 (plurality opinion), Alameda Books, 535 U.S. at 438-49, 122 S. Ct. 1728 (plurality opinion), and it may rely on anecdotal evidence in determining any potential secondary effects. Center for Fair Public Policy v. Maricopa County, 336 F.3d 1153, 1168 (9th Cir. 2003), cert. denied, 541 U.S. 973, 124 S. Ct. 1879, 158 L. Ed. 2d 468 (2004). "Anecdotal evidence and reported experience can be as telling as statistical data and can serve as a legitimate basis for finding negative secondary effects." World Wide Video of Wash. v. City of Spokane, 227 F. Supp. 2d 1143, 1157 (E.D. Wash. 2002). City officials are not required to make particular local findings regarding the secondary effects in the municipality itself; rather, it is "entitled to rely on the experiences of other cities." Buzzetti, 140 F.3d at 140 (quoting Renton, 475 U.S. at 51, 106 S. Ct. 925); see also Renton, 475 U.S. at 51-52, 106 S. Ct. 925 ("The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the

problem that the city addresses.").

The city's legislative record must "fairly support" its secondary effects rationale. Alameda Books, 535 U.S. at 438, 122 S. Ct. 1728. Plaintiff Regensberger has conceded that Waterbury has met its minimum evidentiary burden to demonstrate a valid time, place, and manner regulation. (See Doc. No. 34, Ruling on Motion to Exclude Testimony, Regensberger v. City of Waterbury, No. 04-cv-1900 (PCD), 2006 WL 120335, at *2 (D. Conn. Jan. 13, 2006); see also Section II.A, supra, citing the evidence presented by Defendant Sequin to the Waterbury Zoning Commission.) The burden therefore shifts to Plaintiff to "cast direct doubt" on this rationale, "either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings." Alameda Books, 535 U.S. at 438-39, 122 S. Ct. 1728. If Plaintiff succeeds in casting doubt on Waterbury's rationale in either manner, "the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance." Id. at 439, 122 S. Ct. 1728 (citing Pap's A.M., 529 U.S. at 298, 120 S. Ct. 1382 (plurality opinion)).

Plaintiff attempts to cast doubt on the need for the Adult Establishment Regulation by pointing to the Waterbury's 1995 Adult Establishment Business Ordinance, Section 119.01 et seq. (see Doc. No. 59, Pl.'s Request for Judicial Notice, Ex. 1), arguing that the City's rationale for the 2004 Adult Establishment Regulation is undermined by the existence of the original ordinance. At his deposition, Defendant's expert Dr. McCleary testified that he did not recall being explicitly asked by the City to take into consideration the effect of the 1995 Ordinance on the crime-related secondary effects in the City. (Pl.'s Ex. C, McCleary Dep. Tr. at 124.) He also testified that it is his opinion that the 1995 Ordinance could have mitigated any secondary effects

resulting from adult businesses from 1995 going forward, though he "would focus on the word 'could'" (id.), and the issue remains whether that mitigation was optimal. (Id. at 125.) According to Plaintiff, Dr. McCleary's testimony shows that, given the existence of the 1995 Ordinance, the 2004 Regulation is not narrowly tailored to achieve the desired effects.

However, the Supreme Court has not required in either Renton or Alameda Books that a secondary effects zoning regulation be the least restrictive means to achieving a municipality's goals. See Centerfolds, 352 F. Supp. 2d at 191 ("The requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."). Morever, Plaintiff is not persuasive in arguing that the 2004 Regulation is overbroad given the existence of the 1995 Ordinance. As Defendants explain, the 1995 Ordinance differs from the 2004 Regulation in significant ways. The 1995 Ordinance, which covered several types of adult establishment but did not regulate "adult cabarets," was adopted by the Board of Aldermen as a business ordinance and is not a zoning regulation, which the Zoning Commission has exclusive jurisdiction to enact pursuant to Conn. Gen. Stat. § 8-3. The 1995 Ordinance, unlike the Adult Establishment Regulation, did not address the City's concern in maintaining and encouraging commercial areas and business development in downtown Waterbury. Most significantly, the 1995 Ordinance did not establish a uniform buffer between adult businesses and residential areas and schools, nor did it address other sensitive uses such as churches, parks, and other family residential areas. The 2004 Regulation therefore may be considered a new zoning regulation to regulate adult uses, including adult cabarets, and to address the negative secondary effects caused by those uses, rather than merely a further restriction of the previous adult establishment ordinance.

Plaintiff also attempts to cast direct doubt on the rationale for Waterbury's Adult Establishment Regulation by submitting Rule 26 Reports from two experts, R. Bruce McLaughlin, a city planner, and Randy Fisher, Ph.D., a professor at Central Florida University, and by challenging the rationale offered by Defendant's expert witness, Dr. Richard McCleary. The Court reviews expert testimony in accordance with the admissibility provisions of Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702; <u>Nimely v. New York</u>, 414 F.3d 381, 395 (2d Cir. 2005). The Supreme Court in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), made clear that Rule 702 charges district courts with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." <u>Daubert</u>, 509 U.S. at 597, 113 S. Ct. 2786; <u>see also</u> <u>Nimely</u>, 414 F.3d at 396.

In <u>Daubert</u>, the Supreme Court set out a list of non-exclusive factors that trial courts may consider in determining whether an expert's reasoning and methodology are reliable: (1) whether the theory or technique on which the expert relies has been or could be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the theory or technique has been generally accepted in the scientific community. <u>Daubert</u>, 509 U.S. at 593-94, 113 S. Ct. 2786;

see also Nimely, 414 F.3d at 396. The test of reliability is a "flexible" one depending on the "nature of the issue, the expert's particular expertise, and the subject of his [or her] testimony" and no one factor will necessarily be determinative of the reliability of an expert's testimony, because the district court need only "consider the specific factors identified in Daubert where they are reasonable measures of the reliability of expert testimony." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999); accord Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265-66 (2d Cir. 2002).

Dr. Fisher devotes a section of his reporting attacking Dr. McCleary's analysis of adult businesses' secondary effects on a city, in particular by critiquing Dr. McCleary's methodology in assessing the crime risks caused by adult businesses. (Pl.'s Ex. B, Fisher Report at 3-59.) However, Dr. Fischer is a social psychologist, not a statistician or a criminologist. (See id. at 91.) He is therefore unqualified to critique Dr. McCleary's methodology or expound on criminological theory.

Mr. McLaughlin also critiques the studies from other municipalities on which Waterbury relied in adopting its ordinance. (Id. at 2-3, 23-34.) The Court is not swayed by this expert opinion, however, since Sequin and the Waterbury officials relied on studies previously upheld as legitimate support for a municipality's secondary effects rationale for regulating adult uses. (See Defs.' Ex. V, Weinstein Report.) More importantly, as a general matter, "courts should not be in the business of second-guessing fact-bound empirical assessments of city planners." Alameda Books, 535 U.S. at 451 (citing Renton, supra, at 51-52, 106 S.Ct. 925). Instead, they may presume that a city council knows the streets of its city better than a court does. Id. at 451-52 (citing Turner Broadcasting Sys., Inc. v. FCC, 512 U.S. 622, 665-666, 114 S. Ct. 2445, 129 L.

Ed. 2d 497 (1994); Pap's A.M., supra, at 297-298, 120 S. Ct. 1382 (plurality opinion)).

Accordingly, a city is "entitled to rely on that knowledge; and if its inferences appear reasonable, [the court] should not say there is no basis for its conclusion." Id. at 452.

**One issue raised by Mr. McLaughlin might, however, raise a credibility question between experts which should be left for a factfinder.** Mr. McLaughlin conducted a Waterbury-specific study demonstrating that, contrary to the studies about other municipalities introduced by Defendants at the time the Regulation was adopted, the existence of adult business in Waterbury has had no negative effect on property values. (Pl.'s Ex. A, McLaughlin Report at 36-39.) Mr. McLaughlin studied the property value increases in several areas in Waterbury between the years 1999 and 2003. Defendants dispute the accuracy and significance of Mr. McLaughlin's valuation findings, however, on the grounds that Mr. McLaughlin had failed to consider the fact that Waterbury did not conduct a property revaluation between 1980 and 2001. (Defs.' Reply, Ex. A, Dietsch Aff. ¶¶ 4-5.) However, McLaughlin mentions that he chose the particular time range in his analysis in part due to the inclusion of an overall revaluation in each area (McLaughlin report at 36), and the revaluation period alone would not be a basis for excluding his opinoin. Regardless of Defendants' argument, however, McLaughlin's testimony is unconvincing: the absence of evidence of a decrease in property values due to adult establishments in the time period studied by McLaughlin does not foreclose the City's reliance on the evidence of other municipalities' evidence of secondary effects, nor would it undercut the value of such studies. Even if McLaughlin arguably raises some credible expert testimony that differs from Defendants' expert evidence, it is not enough to create a genuine issue of material fact for trial on the City's substantial interest in issuing the Regulation.

### D. Adequately Alternative Means of Communication

To pass constitutional muster, the Adult Establishment Regulation must also allow reasonable adequate alternative avenues of communication. <u>Alameda Books</u>, 535 U.S. at 434, 122 S. Ct. 1728 (plurality) (<u>citing</u> <u>Renton</u>, 475 U.S. at 50, 106 S. Ct. 925). A secondary effects zoning regulation cannot effectively deny an adult establishment a reasonable opportunity to operate. <u>Renton</u>, 475 U.S. at 54, 106 S. Ct. 925. In evaluating the reasonableness of available alternatives, there is no bright-line rule for determining how much land is required, <u>Casanova</u>, 375 F. Supp. 2d at 341 (<u>quoting</u> <u>MJ Entm't</u>, 328 F. Supp. 2d at 485-86), and courts review the totality of evidence to determine what areas within a city remain available for adult-oriented businesses and whether these areas afford a reasonable opportunity to locate and operate such a business. <u>Casanova</u>, 165 F. App'x 72, 2006 WL 238434, at *2 (citations omitted); <u>see also</u> <u>Hickerson v. City of New York</u>, 146 F.3d 99, 107-08 (2d Cir. 1998); <u>Buzzetti</u>, 140 F.3d at 140-41.

In contemplating the establishment of the 750-foot buffer zone in the Adult Establishment Regulation, the City acknowledged the need to allow for alternative avenues and considered several different-sized buffer zones. (<u>See</u> Defs.' Ex. B, Feb. 26, 2004 Tr. at 18-21.) Mr. Sequin recommended the 750-foot buffer zone to the Zoning Commission at the February 26, 2004 hearing on the grounds that such a distance would provide alternative avenues given the City's area. (<u>Id.</u>) Given the adult establishment buffer zones upheld by other federal courts, the 750-foot buffer provided by the Adult Establishment Regulation constitutes a reasonable regulation. See, e.g., <u>Casanova</u>, 375 F. Supp. 2d at 321 (upholding a 400-foot buffer).

The City also took into consideration the legal precedent concerning acceptable area

percentage. (See Def.'s Ex. B, Feb. 26, 2004 Tr. at 22). A map submitted to the Zoning

Commission when considering the adoption of the Regulation (Ex. T) shows the acreage

available in Waterbury's IG zones to locate adult establishments. "A court must consider the

'physical and legal availability of the alternative sites with the municipality's borders and

whether those sites are part of an actual business real estate market' when determining whether

reasonable avenues of communication exists." Casanova, 375 F. Supp. 2d at 339 (quoting

Hickerson, 146 F.3d at 104). "Federal courts, therefore, have found that reasonable alternative

avenues of communication exist if there is sufficient land area, in all states of development, open

for use by adult businesses." MJ Entm't, 328 F. Supp. 2d at 484. Sites may be considered

available regardless of whether they are already occupied by other business or require additional

work to make them suitable for adult entertainment. Renton, 475 U.S. at 53; Hickerson, 146

F.3d at 106. Courts in this circuit have applied a liberal set of criteria to evaluate alternative

available sites for locating adult establishments. See Casanova, 375 F. Supp. 2d at 326-333. See

also Topanga Press, Inc. v. City of Los Angeles, 989 F.2d 1524, 1533 (9th Cir. 1993).

Defendants' expert Alan Weinstein, Ph.D., has assessed the alternative avenues of

communication in Waterbury. In his report, he indicates that there are roughly 10-12 sites

available. (Defs.' Ex. V., Weinstein Report at 8-9.) On the other hand, Plaintiff's expert

McLaughlin states there are only 7-9 potential sites by geography alone and that only two of

those sites are commercial in nature and thus a part of the relevant commercial market. (Pl.'s Ex.

A, McLaughlin Report at 43.) Defendants point to the Second Circuit's decision in Casanova,

375 F. Supp. 2d 321, in which Mr. McLaughlin provided an alternative avenues of

communication analysis for the plaintiff. The Second Circuit reviewed the competing expert

testimony and concluded that Mr. McLaughlin, as well as the other plaintiff's experts, had submitted too restrictive of a view of alternative avenues of communication, thereby concluding that the regulation in question was constitutionally adequate. 375 F. Supp. 2d at 326-33. Although McLaughlin's methodology cannot be rejected outright simply because it was not accepted by the court in Casanova, but the Court now finds that it is not relevant to a degree that would foreclose proper reliance by the City on Weinstein's evidence. In other words, McLaughlin provides an alternative view to Weinstein's but not a contradiction that would present a genuine issue of material fact for trial. For that reason, Defendants have sufficiently demonstrated that alternative avenues of communication exist so as to comport with the First Amendment.

## IV. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. No. 44] is **denied,** and Defendants' Cross-Motion for Summary Judgment [Doc. No. 56] is **granted.** The Clerk shall close the file.

SO ORDERED.

Dated at New Haven, Connecticut, this   22nd  day of August, 2008.

_____
            /s/
Peter C. Dorsey, U.S. District Judge
United States District Court